IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FENCE CREEK CATTLE CO.,           )
                                  )
            Plaintiff,            )           Civil No. 06-1236-SU
                                  )        **FINDINGS AND RECOMMENDATION**
      vs.                         )
                                  )
U.S. FOREST SERVICE, et al.,      )
                                  )
            Defendants.           )
_____)

**SULLIVAN, Magistrate Judge:**

### Findings and Recommendation

Fence Creek Cattle Company (Fence Creek) brings this action against the United States Forest Service and Mary DeAguero and Barbara Walker, in their official capacities as District Rangers with the Wallowa-Whitman National Forest (collectively Forest Service). Fence Creek seeks judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706,

and other applicable law,[1] of the U.S. Forest Service's final action to cancel two grazing permits through administrative action. (Compl. ¶ 4 and AR at 0778.)

Before the court are Fence Creek's Motion for Judicial Notice, or Alternatively, for Extra-Record Review, and the parties' cross-motions for summary judgment. Oral argument was heard on all three motions and, for the reasons that follow, Fence Creek's Motion for Judicial Notice, or Alternatively, for Extra-Record Review should be denied; the Forest Service's Motion for Summary Judgment should be granted; and Fence Creek's Motion for Summary Judgment should be denied.

## Discussion

### I.  Judicial Notice/Extra Record Review

As a threshold matter, Fence Creek requests the court take judicial notice of 25 grazing permit files from the U.S. Forest Service that it obtained through the Freedom of Information Act. Alternatively, Fence Creek requests the court expand the Administrative Record in this case to include the 25 grazing permits.[2] According to Fence Creek, the court should look beyond

---

[1]    Fence Creek asserts claims under the National Forest Management Act, 16 U.S.C. §§ 472a, 521b, 1600, 1611-1614; the Taylor Grazing Act, 43 U.S.C. §§ 315-315r; the Granger-Thye Act, 16 U.S.C. §§ 580g, 580h, 5801; the Declaratory Judgment Act, 28 U.S.C. § 2201; the Administrative Procedures Act, 5 U.S.C. §§ 551-559, 701-706, and scattered sections of Title 5; and Due Process for failure to provide a pre-deprivation hearing.

[2]    Fence Creek also seeks admission of the "Addendum to Real Estate Sale Agreement," attached as Exhibit 1 to the Declaration of Paul A. Turcke, that was submitted to the Forest Service during the administrative appeal process, but inadvertently omitted from the Administrative Record filed with

the Administrative Record and consider the 25 grazing permits because the permits "are necessary to place the decision(s) at issue in a proper context and to fully explain the basis for the agency decision." (Pl.'s Memo. Supp. Judicial Notice 3.)

This matter arises under the APA and this court's review is limited solely to the record before the Forest Service. *See Camp v. Pitts,* 411 U.S. 138, 142 (1973)(judicial review of agency action is confined to the administrative record "already in existence"). *See also Southwest Ctr. for Biological Diversity v. United States Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir. 1996)("Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court.").

The Ninth Circuit has, however, "crafted *narrow* exceptions to this general rule." *The Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir. 2005)(emphasis added). District courts may admit extra-record evidence, in limited circumstances: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record; (3) when supplementing the record is necessary to explain technical terms or complex

_____

the court. The Forest Service stipulates that document is part of the Administrative Record.

Page 3 - FINDINGS AND RECOMMENDATION

subject matter; or (4) when plaintiffs make a showing of agency bad faith." *Id.* (internal citation and quotation marks omitted).

Recently, the Ninth Circuit emphasized that district courts should grant requests to expand an administrative record only in limited circumstances. *Id.* "Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding, in effect, *de novo* rather than with the proper deference to agency processes, expertise, and decision-making." *Id.*

Here, Fence Creek asks the court to consider 25 grazing permits that were not presented to the Forest Service for review. The court declines to do so. The record before the court is already complex and, more importantly, complete. Further, Fence Creek has not made an adequate showing of necessity or any other exception to the general rule that would warrant expansion of the record. Finally, Fence Creek has not explained its failure to move the agency to supplement its record with this evidence. If the record is incomplete, the litigants are expected to request leave from the agency to supplement the record prior to seeking to expand the record before the district court. *See The Lands Council, 395 F.3d at 1030 n.10.*

At oral argument, the Forest Service indicated that if the court admits the 25 permits on behalf of Fence Creek, the Forest Service would then request leave to expand the record on its own

Page 4 - FINDINGS AND RECOMMENDATION

behalf.   To allow such unbridled expansion of the administrative record would be to disregard both this court's statutory duty to give deference to the agency's expertise, and the Ninth Circuit's directive that a reviewing court should authorize expansion of the record only in limited circumstances.   Fence Creek's Motion for Judicial Notice, or Alternatively, for Extra-Record Review should be denied.

## II.   Review of the Forest Service's Final Action

A.   <u>Background</u>

This action arises from a series of transactions, beginning with the sale of livestock and of real property in Eastern Oregon known as the Lucky Diamond Ranch (Ranch).   The sellers were the family of Delbert Lewis and Garnet Lewis (Lewis), who entered into a real estate sales agreement in September 2003, for the sale of the Ranch to Gazelle Land and Timber, LLC (Gazelle).   The real estate sales agreement provided that Lewis would deliver grazing permit waivers to Gazelle, or Gazelle's nominee, for grazing allotments that included the Log Creek and Chesnimnus allotments at issue here.[3]   The real estate sales agreement also provided that parcels of the Lewis property would be conveyed to Fence Creek. Fence Creek, a partnership registered in Oregon in December 2003,

---

[3]      The Forest Service allows livestock grazing on National Forests. *See* 16 U.S.C. §§ 5801, 1752; 6 C.F.R. Pt. 22 (regulations governing grazing permits).   When the holder of a grazing permit sells either the base property or permitted livestock, the purchaser may obtain a grazing permit from the Forest Service if the seller/permit holder has waived the grazing permit back to the Forest Service in favor of the purchaser.   36 C.F.R. § 222.3(c)(1)(iv).

was created by Bruce and Mary Agar pursuant to an agreement executed on February 4, 2004. (AR at 523-524.)

Fence Creek provided a Bill of Sale and escrow instructions to the Forest Service, dated December 15, 2003, indicating it purchased 1,459 cattle and 92 bulls from the Delbert Lewis Estate. (AR at 493-96.) On February 5, 2004, Fence Creek applied for a grazing permit from the Forest Service on the Log Creek, Chesnimnus, Dodson-Haas and Middlepoint allotments. (AR at 525-26.) The grazing permit for the allotments was supported by waivers from Delbert and Garnet Lewis and Barbara Kudrna, the permittees holding the grazing permit. The Log Creek allotment was permitted for 247 cattle for variable seasons for a period of 5.38 months to Geraldine Lewis and Barbara Kudrna; and the Chesnimnus allotment was permitted for 850 cattle to Delbert and Garnet Lewis from June 1 through October 31. (AR at 527, 528, 558.) The waivers were also signed by Bruce and Mary Agar for Fence Creek.[4]

On February 6, 2004, the Forest Service issued Term Grazing Permit #24005 for four allotments, including Log Creek and Chesnimnus, pursuant to the Waivers of Term Grazing Permit and Fence Creek's Application for Term Grazing Permit. The permit authorized 247 cattle to graze on the Log Creek allotment and 850 cattle to graze on the Chesnimnus allotment. (AR at 529.)

---

[4]    Dodson-Haas and Middlepoint allotments were not at issue in this case.

Page 6 - FINDINGS AND RECOMMENDATION

On February 26, 2004, Gazelle  entered into a joint venture agreement with Fence Creek (Bruce and Mary Agar); Wayne Smith and Michele Smith; and Monty Siddoway and Shelly Siddoway.  (King Williams Decl. Ex. 1, April 20, 2007.)  The joint venture agreement stated: "Gazelle, Siddoways (sic), Smiths and Fence Creek have purchased the real property, cattle, and Allotments as a joint venture wherein each entity has borrowed money secured on each entity's ownership and the expectation that the entire combination of acquisitions would be operated for the common good for servicing the debt of all parties."  The joint venture agreement also provided, "Fence Creek has purchased 1459 head of cattle and the associated United States Forest Service Grazing Allotments." (Williams Decl. Ex. 1.)

The parties agreed to their own individual obligations.  Fence Creek agreed to maintain necessary documentation for the validation and maintenance of the grazing allotments.  The joint venture agreement was subsequently amended, with the execution of the final agreement occurring on October 19, 2004.  The amended agreement stated that "Fence Creek Cattle Co., an Oregon partnership consisting of Bruce and Mary Agar . . . purchased as part of a larger transaction approximately 2,602 acres of real property in Wallowa County, Oregon . . . ."  (AR at 577-578.)  The essential terms of the agreement regarding Fence Creek, as stated above, did

not change.[5]  The parties mutually agreed that the real property, cattle, and allotments were to benefit the joint venture.

In June 2005, the Forest Service began to question the ownership of the cattle appearing on the four allotments.  (AR 628-629.)  On June 13, 2005, Rick Smith with the Forest Service talked to Bruce Agar about the Fence Creek grazing permits.  The Forest Service observed cattle on the Chesnimnus allotment that were not branded with the Lucky Diamond brand.  (AR at 603.)  Wayne Smith, a member of the joint venture, had been grazing his cattle on the allotment.  Smith's cattle had a different brand and had not been branded with the Lucky Diamond brand, although Bruce Agar had been told that the cattle were properly branded.  Bruce Agar explained that Smith was supposed to have been made a partner in Fence Creek but that it had not occurred.  Rick Smith asked Wayne Smith and Bruce Agar to provide written clarification, by June 22, 2005, of the cattle brands and ownership of the cattle seen on the Chesnimnus allotment.  (AR at 601, 604, 628.)  The Forest Service sought to determine whether the permit had been violated by unauthorized grazing.

Meanwhile, disputes arose among the members of the joint venture.  On June 17, 2005, the parties resolved the disputes by executing a "Settlement Agreement, Dissolution Agreement,

---

[5]      Two parties were also added to the amended agreement.

Indemnification Agreement and Release of Claims" (Settlement Agreement). (AR at 612-617.)[6] King Williams and Michael Smith also signed a "Partnership Interest Transfer Agreement," in which the Agars were to transfer "100% membership interest in the Company [Fence Creek]." However, there is no indication in the record that the Agars signed this document. (AR at 607.)

The Settlement Agreement provided that in exchange for a lump sum payment to the Agars and the Siddoways, "Fence Creek will execute statutory warranty deeds to Gazelle or its nominee. . . ." (AR at 612.) The Agars and Fence Creek agreed to convey to Gazelle the real property they had purchased pursuant to the joint venture agreement, except for a 17-acre parcel that the Agars retained. The Agars and Fence Creek agreed to convey "all merchantable stock cows . . . with the Lucky Diamond healed brand . . . ." "Calves and bulls to be retained by Fence Creek" were to be moved off Gazelle's property. (AR at 613.) The Settlement Agreement provided that "Fence Creek hereby transfers all right, title and interest in the Fence Creek partnership, Fence Creek brands and all other brands purchased from Lewis, and the Associated U.S. Forest Service Grazing Allotments including the Chesnimnus, Dodson-Haas and Log Creek allotments to Gazelle or its nominee."[7] (AR at 613.)

---

[6]    While the parties agree that the joint venture disputes were resolved by a Settlement Agreement, no signed Agreement appears in the record. The Agars also refer to the executed Settlement Agreement via a letter from their attorney.

[7]    Permits could not be transferred. (AR 532)

On June 24, 2005, King Williams told Mitchell Bulthuis of the Forest Service that he had "severed ties" with the Agars and that he was "now Fence Creek Cattle Company and would like the Forest Service to recognize this." (AR at 623 (Bulthuis notes on conversation with Williams).) Williams said that the partners in Fence Creek would be Wayne Smith and Gazelle, and that the new partnership would keep the Fence Creek name.[8] Williams stated that he intended to change Fence Creek to a schedule C corporation. Bulthuis indicated that a change of ownership would mean a deed change, which would trigger the need for a waiver of permits by Fence Creek in favor of new partners or entity and the issuance of a new grazing permit. (AR at 623.)

In an attempt to confirm that the ownership requirements of grazing permit #24005 were satisfied, Barbara Walker, District Ranger, sent a letter dated June 28, 2005, to Fence Creek requesting specific documentation regarding the purchase of the cattle, the base property, the culling of the herd and the status of the Fence Creek partnership. (AR at 628.) Specifically, Walker requested documents showing how many cattle Fence Creek purchased from Lewis; how many cattle purchased from Lewis were sold to third parties; and the status of the Fence Creek partnership, including a list of the partners. Walker wrote, "If Fence Creek Cattle

---

[8]     There is no evidence in the record that Fence Creek Cattle Company was registered in Oregon with partners other than Bruce and Mary Agar.

Company is in the process of changing partners I will need supporting documentation in order to initiate a waiver of the existing permit if required." (AR at 629.)

On July 5, 2005, Bruce and Mary Agar visited the Forest Service office to respond to the inquiry about ownership of the livestock on the grazing allotments. The Agars informed the Forest Service that they had purchased only 600 head from Lewis; that they had not seen the Bill of Sale for 1,459 head from Lewis; and that their intent was to have the Siddoways and Wayne Smith enter the Fence Creek partnership (the Siddoway's and Wayne Smith were never made partners). (AR at 642.) Before this was accomplished with the State of Oregon or with the Forest Service, cattle were added to the 600 head that the Agars had purchased. These cattle did not have the Lucky Diamond brand.

The Agars asked if the permits could be waived from Fence Creek to King Williams. The Forest Service indicated that before a waiver could be signed, the Forest Service required the actual number of cattle purchased by Fence Creek from Lewis, identification of the cattle on the Chesnimnus allotment in 2004, and the partnership status of Wayne Smith. The Agars told the Forest Service that they had asked King Williams to respond to these questions, however the Forest Service directed the Agars to respond to the questions. (AR at 643.)

In July 2005, Fence Creek responded with two letters, dated

Page 11 - FINDINGS AND RECOMMENDATION

July 13 and July 18, respectively, and supporting documents. (AR at 662, 670.) The documents included Oregon Brand Inspection Certificate #C268212, indicating that 600 head of permitted cattle were transferred from Garnet and Curtis Lewis (for Chesnimnus permit) to Fence Creek, and Oregon Brand Inspection Certificate #C262813, indicating that 859 head of permitted livestock were sold directly from Garnet and Curtis Lewis to buyers other than Fence Creek. (AR at 451, 452.)

On September 1, 2005, the Agars executed an Assignment of Partnership Interest assigning and transferring a "100% Partnership interest" in Fence Creek to King Williams and Michael Smith. (Gary Roberts Decl. Ex. 1, May 25, 2007.) Fence Creek Ranch, LLC was registered with the Oregon Secretary of State on September 9, 2005. (AR at 969.) Also on September 1, 2005, the Agars signed a Waiver of Term Grazing Permit listing Fence Creek Ranch, LLC, as purchaser. (AR at 675-676.) The waiver form was not signed by any of the purchasers or by any witnesses. The Forest Service received the incomplete waiver form on October 24, 2005.

On September 6, 2005, the Forest Service issued a letter of non-compliance to Fence Creek and requested documentation to support the purchase of the permitted cattle. (AR at 680-682.) Walker requested information establishing the sale of the Lewis permitted livestock to Fence Creek. (AR at 681).

On September 30, 2005, Fence Creek responded with additional

Page 12 - FINDINGS AND RECOMMENDATION

information.    (AR at 729-732.)    With respect to the 600 cattle purchased from the Lewis family, Fence Creek provided the following information:

> **Purchase of 600 Head by Fence Creek.**  The 600 head of mother cows purchased from Delbert and Garnett Lewis, as outlined in Brand Certificate No. C262812, were acquired with a loan from Old West Federal Credit Union in the amount of $561,000. Although this sum was borrowed by Wayne and Michelle Smith, I also signed the Note.  Notwithstanding the use of Wayne and Michelle Smith as primary borrowers, I considered my signature on the Note as evidence sufficient of my responsibility for that debt and Fence Creek's acquisition of those six hundred head.

(AR at 730.)

A few months earlier, however, in a letter dated July 18, 2005, Fence Creek provided the following "proof of purchase of the Lewis Estate Livestock" to the Forest Service:

> a.    Bill of Sale from Garnet Lewis, PR Estate of Delbert Lewis showing that Fence Creek Cattle Company purchased 1459 head of Cows and 92 Bulls for the price of $1,250,000.  Actually only 600 head of these Cows and 25 Bulls were Brand Inspected to Fence Creek Cattle Company. *These 600 head were paid for by funds derived from a note payable at Old West Federal Credit Union in Wayne Smith's name for $561,000.00* (Exhibit IA).  *These funds were then put in Gazelle's Checking account for wire to Wallowa Title Company.*

(AR at 670 (emphasis added).)

On October 19, 2005, the Forest Service notified Fence Creek Ranch, LLC, that cattle on the National Forest land that would be subject to a transfer of ownership on October 20, 2005, were not permitted cattle and had to be removed.  (AR at 735.)

On October 21, 2005, Bruce Agar wrote to Walker, notifying the

Forest Service that the brands registered to the Agars, including the Lucky Diamond brand, would be transferred to King Williams and Michael Smith, now doing business as the Fence Creek Ranch, LLC. The base property and the cattle with the Lucky Diamond brand had been sold to Williams and Smith. Bruce Agar stated that the Agars would be "cancelling" the Fence Creek partnership and the assumed business name effective November 1, 2005. (AR at 736.)

The Agars went to the Forest Service office on October 25, 2005, to discuss the change in their business. As of November 1, 2005, they would operate as Bruce and Mary Agar, doing business as Durbin Creek Ranch. They indicated that they had signed waivers in favor of Fence Creek Ranch, LLC. Rick Smith informed the Agars that the responses to the Forest Service inquiries could result in the partial or total cancellation of their grazing permits. Rick Smith told the Agars that "the future of the Fence Creek Cattle Company permits was being discussed and studied by the FS legal staff prior to making a final decision." (AR at 737.)

On October 31, 2005, the Agars again discussed the change in their business name with Rick Smith. Rick Smith reminded the Agars that the Fence Creek grazing permit had not been validated and that the Agars were not in a position to waive the permit in favor of any new permittee, including the Agars doing business as Durbin Creek Ranch. (AR at 740.)

Also on October 31, 2005, King Williams met with Forest

Page 14 - FINDINGS AND RECOMMENDATION

Service personnel.  Notes from that meeting indicate that there was a validation issue regarding the grazing permits "addressed to Agar" and that the Forest Service had not yet made a decision on the permits.  (AR at 743.)

On December 9, 2005, the Forest Service issued a written Decision addressed to Bruce and Mary Agar, Fence Creek Cattle Co., cancelling the Fence Creek grazing permit for the Log Creek and the Chesnimnus allotments.  No action was taken on the Middlepoint and Dodson-Haas allotments.  The Agars were advised of Fence Creek's appeal rights.

On January 5, 2006, the Fence Creek Cattle Co. registration with the State of Oregon was cancelled.  (AR at 966-968.)  On January 6 and 21, 2006, the Agars, as individuals, granted power of attorney to King Williams, Michael Smith, and Fence Creek Ranch, LLC, to sign all documents regarding appeals on the denial of the grazing permit for the Log Creek and Chesnimnus allotments.  (AR at 847-848.)  On January 23, 2006, Fence Creek filed an appeal of the December 9, 2005 Decision.

On March 1, 2006, the interested parties met in an attempt to resolve the issues regarding the Log Creek and Chesnimnus allotments.  The Agars did not attend the meeting.  The Forest Service asserted that the documentation previously received regarding the grazing permit was not enough to change the decision and that more information was needed.  No resolution was reached

and the meeting was held open for 30 days.  (AR at 896-901.)

On May 24, 2006, a Decision on the first-level appeal affirming the Forest Service Decision to cancel the allotments was issued.  (AR at 939-949.)  On June 5, 2006, a second-level review of the Decision on behalf of Fence Creek Cattle Company was made, and, on July 20, 2006, the Forest Service issued its final administrative Decision affirming the decision cancelling the grazing permit for the Log Creek and Chesnimnus allotments.  (AR at 954, 960-962.)  Fence Creek then filed this action seeking judicial review of the administrative decision to cancel the Log Creek and Chesnimnus allotments from the grazing permit.

B.   Legal Standard

Pursuant to the APA, Fence Creek seeks judicial review of the Forest Service's final action.  *See* 5 U.S.C. § 701 *et seq.*  Under this statute, the district court may set aside the agency's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under this narrow standard, the agency need only "articulate a rational connection between the facts found and the conclusions made."  *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 384 F.3d 1163, 1170 (9th Cir. 2004)(internal citation and quotations omitted).

The district court may not substitute its own judgment for that of the agency, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,*

463 U.S. 29, 43 (1983), and in general should defer to the agency, *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir. 1993), given that "an agency's interpretation of its regulations is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation[s].'" *Marathon Oil Co. v. United States,* 807 F.2d 759, 765 (9th Cir. 1986) (quoting *Udall v. Tallman,* 380 U.S. 1, 16-17 (1965)).

In conducting its review, the court may look only to the administrative record to determine whether the agency has articulated a rational basis for its decision. *See Camp*, 411 U.S. at 142. *See also SEC v. Chenery Corp.,* 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

C.   Analysis

The United States Forest Service, through the Secretary of Agriculture, is charged with preserving public and national forests and protecting them against any depredations. 16 U.S.C.A. § 551. As stewards of the public lands, the Forest Service is given authority to issue, suspend, or revoke grazing permits for any holder who violates the terms of the permit. *Osborne* v. *United States*, 145 F.2d 892, 895 (9th Cir. 1944). In this case, the Forest Service has decided to cancel permits issued on two allotments in the Wallowa Whitman National Forest because ranchers violated their

limited license to turn cattle out on public lands.[9]

Fence Creek challenges the Forest Service's "final agency action"[10] on the grounds that:  (1) the Forest Service illegally cancelled the Log Creek Permit; (2) the Forest Service illegally reduced and cancelled the Chesnimnus Permit; and (3) the Forest Service's review procedures violated Constitutional due process guarantees.

Although the relationships and transactions precipitating the dispute in this case were unquestionably complex and, at times, confusing the issues before this court can be simply stated:  (1) Did Fence Creek,[11] purchase the livestock that were permitted by term grazing permit #24005 to graze on the Log Creek and Chesnimnus allotments; and (2) Were the cattle grazing on those allotments the cattle authorized by term grazing permit #24005?  After determining there was insufficient evidence to support a conclusion that Fence

---

[9]    Congress has not conferred upon citizens the right to graze cattle upon public lands; the government has merely suffered the lands to be used. *Buford v. Houtz*, 133 U.S. 320, 326 (1918); *see Light v. United States*, 220 U.S. 523, 535 (1917); *Omaechevarria v. Idaho*, 246 U.S. 343, 352 (1918); *see also Osborne v. United States*, 145 F.2d 892, 894 (9th Cir. 1944). The Secretary of Agriculture, in the exercise of his general power, may exclude cattle from forest reserves because the citizen possesses no right to graze. *U.S. v. Grimaud*, 220 U.S. 506; *Light*, 220 U.S. at 531; *see also Shannon v. United States*, 160 F. 870, 873 (9th Cir. 1994); *Bell v. Apache Maid Cattle Co.*, 94 F.2d 847 (9th Cir. 1938).

[10]    Here, the final agency action occurred on July 20, 2006, when Fence Creek's second level appeal affirming the Forest Service's December 9, 2005 Decision was denied by the deputy regional forester.  (AR at 960-62.)

[11]    Fence Creek, a partnership consisting of Bruce and Mary Agar, was the applicant and permittee of the grazing permits at issue.  The Court has previously determined that Fence Creek Cattle Company is the real party in interest even though Bruce and Mary Agar did not participate as parties in the action.

Page 18 - FINDINGS AND RECOMMENDATION

Creek had purchased the permitted livestock, and that unauthorized livestock were grazing on the Log Creek and Chesnimnus allotments, the Forest Service cancelled those grazing permits.  Now this court must determine whether that decision was arbitrary and capricious.

    1.  <u>Log Creek Permit</u>

In its December 2005 Decision, the Forest Service determined that "Fence Creek has not shown evidence that they purchased 247 head of permitted Log Creek Allotment livestock from Geraldine Lewis and Barbara Kudrna." (AR at 775.)  Based on that finding, the Forest Service concluded that "the Waiver submitted by Fence Creek for the purchase of the 247 head of permitted livestock from Geraldine Lewis and Barbara Kudrna Term Grazing Permit #22008 is ineligible."  (AR at 775.)  Accordingly, the Forest Service canceled the Log Creek allotment portion of Fence Creek's Term Grazing Permit.

First, Fence Creek contends that the Forest Service erroneously concluded that there was insufficient documentation of the purchase and ownership of the livestock grazing on the Log Creek allotment.  Relying on regulation 2209.13.12.22 from the Forest Service Handbook (FSH), Fence Creek explains that "the Forest Service need only document a 'bona fide transaction' and is not compelled to follow any magic formula or compile any specific quantum of evidence, but rather enough information to support a reasonable conclusion that actual transfer of funds occurred for

Page 19 - FINDINGS AND RECOMMENDATION

'the full value' of the animals." (Pl.'s Mem. Supp. Summ. J. 11.)
According to Fence Creek there is "ample documentation" in the
record to satisfy the "bona fide transaction" standard and,
moreover, the documentation was presented to the Forest Service on
numerous occasions. (Pl.'s Mem. Supp. Summ. J. 11-12.)

    The record reflects that the Forest Service sought to resolve
discrepancies related to the purchase of 247 cattle authorized
under the Log Creek permit.   The Forest Service  repeatedly
requested supporting evidence that Bruce and Mary Agar, the Fence
Creek partnership,[12] purchased the cattle grazing on the Log Creek
allotment as represented in both the Waiver of Term Grazing Permit
and Application for Term Grazing Permit.   (AR at 525, 527.)
Additionally, the Forest Service engaged all interested parties
over a period of several months in both conversation and
correspondence in an effort to resolve the ownership discrepancies
impacting the grazing permit.

    In their Application for Term Grazing Permit, the Agars
represented they had purchased 1,459 head of cattle marked with the
Half Box Lazy D, Lucky Diamond and El brands.  (AR at 525-526.)
Based on that unequivocal and express representation, and the
supporting documentation, including the Waivers of Term Grazing
Permits from members of the Lewis Family and the Bill of Sale, the

---

[12]    The Forest Service does not recognize a joint venture as an entity
eligible to hold a term grazing permit.  (AR at 382 (FSH 2209.13, 12
(Eligibility and Qualification Requirements for Permits with Term Status)).)

Forest Service issued a Term Grazing Permit to Fence Creek. (AR at 493 (Bill of Sale for 1,459 cows to Bruce and Mary Agar); AR at 525-526 (Agars represent they own 1,459 cattle and Old West Federal Credit Union was the only other interest holder in that livestock); AR at 527, 558 (Agars sign Waivers).)

In contrast to the unequivocal and express representations by the Agars of ownership of 1,459 cows, the record reveals the following undisputed evidence:

- Brand Inspection Certificate # C6262812, dated October 31, 2003, documents the sale of 600 cows, branded with a Lucky Diamond and E1, from Garnet and Curtis Lewis to "Fence Creek Cattle Company LLC." (AR at 451.)

- Brand Inspection Certificate # C262813, dated October 31, 2003, documents the sale of 859 cows, branded with a Lucky Diamond and E1, from Garnet and Curtis Lewis to an unspecified purchaser. (AR at 452.)

- A Commercial Promissory Note in the amount of $561,000, dated December 22, 2003, lists Wayne and Michelle Smith as borrowers and Old West Federal Credit Union as the lender. (AR at 505.)[13]

- In response to Barbara Walker's June 28 letter requesting supporting documentation for the Bill of Sale for 1,459 head of livestock, the Agars met with Rick Smith at the Forest Service's Enterprise office on July 5, 2005. At that time, the Agars stated they had purchased only 600 cows. Further, they indicated that they had brand inspections and cancelled checks for only 600 cattle, branded with a Lucky Diamond, they had purchased in 2003. The Agars also denied ever seeing the Bill of Sale for 1,459 cows and 92 bulls. (AR at 642-643.)

---

[13]    In its December 9, 2005 Decision, the Forest Service states that "[t]he Promissory Note was signed by Wayne and Michelle Smith in addition to Bruce and Mary Agar as Fence Creek, listed as 'partners in collateral.'" (AR at 774, see also AR at 730.) The court was unable to locate this signatory page in the administrative record but accepts the undisputed representation that the Agars signed the Notes.

- In a letter to Barbara Walker, dated July 18, 2005, Fence Creek provided the following "proof of purchase of the Lewis Estate Livestock" to the Forest Service:

  > 1a.  Bill of Sale from Garnet Lewis, PR Estate of Delbert Lewis showing that Fence Creek Cattle Company purchased 1459 head of Cows and 92 Bulls for the price of $1,250,000.  Actually only 600 head of these Cows and 25 Bulls were Brand Inspected to Fence Creek Cattle Company. *These 600 head were paid for by funds derived from a note payable at Old West Federal Credit Union in Wayne Smith's name for $561,000.00* (Exhibit IA).  *These funds were then put in Gazelle's Checking account for wire to Wallowa Title Company.*

  (AR at 670 (emphasis added).)

- In a letter to Barbara Walker, dated July 18, 2005, the Agars provided the following information regarding the purchase of the additional 859 cows:

  > 1b.  Brand Inspection Certificates.  These two Brand Inspections were for cattle going in two different directions. . . .  The 859 head #C262814 was an open inspection for accounting purposes only . . . .  These 859 head *were sold to different buyers directly by Garnet Lewis* . . . .

  (AR at 670 (emphasis added).)

- In a letter to Barbara Walker, dated July 18, 2005, the Agars provided the following information regarding the brand certificates:

  > 2a.  The only brand inspection that Fence Creek Cattle Company has to show is # C262812 for 600 cows.

  (AR at 671.)

- In a letter to Barbara Walker, dated July 18, 2005, the Agars stated: "In summary, the Fence Creek Cattle Company purchased 600 cows and then obtained another approximate 400 cows to validate the permit.  These documents show that on these transactions. (AR at 665.)

- In a letter to Barbara Walker dated September 30, 2005, Bruce Agar stated as follows:

> The 600 head of mother cows purchased from Delbert and Garnett Lewis, as outlined in Brand Certificate No. C262812, were acquired with a loan from Old West Federal Credit Union in the amount of $561,000. Although this sum was borrowed by Wayne and Michelle Smith, I also signed the Note. Notwithstanding the use of Wayne and Michelle Smith as primary borrowers, I considered my signature on the Note as evidence sufficient of my responsibility for that debt and Fence Creek's acquisition of those six hundred head.

(AR at 730.)

There can be no dispute that the foregoing evidence directly contradicts the representations made by the Agars in their Application for Term Grazing, filed several months after the transfer of the subject livestock, that they "own[ed] 1459 head of cattle." (AR at 525.)  The Forest Service reasonably relied upon those statements of ownership by the Agars when it issued Fence Creek the Term Grazing Permit.  Fence Creek points to no evidence in the record that the Forest Service approved, or was even aware of, this discrepancy prior to the issuance of the grazing permit.

Although the Forest Service accepted the Agars "circumstantial and unorthodox" documentation and explanation and allowed that 600 cows had been purchased by the Agars, it concluded that Fence Creek failed to show it purchased the additional 859 livestock relied upon to support the issuance of the grazing permit.  To the contrary, the record includes numerous statements by the Agars that they purchased only 600 cows, and the Oregon brand certificates show only 600 cows purchased by Fence Creek.  As such, it was not arbitrary and capricious for the Forest Service to conclude that

Page 23 - FINDINGS AND RECOMMENDATION

there was not a bona fide transaction with respect to the purchase of the 1459 cows and 92 bulls to support the issuance of the Term Grazing Permit.  Accordingly, the court declines to set aside that finding by the Forest Service as arbitrary and capricious.

Next, Fence Creek challenges the Forest Service's determination that of the 600 cows Fence Creek was able to establish ownership, 247 of them were not the cattle previously grazed on the Log Creek allotment by Lewis/Kudrna.  (Pl.'s Mem. Supp. Summ. J. 14.)  According to Fence Creek, the Kudrna affidavit provides adequate documentation that the 247 cows on the Log Creek allotment were the permitted livestock.

Fence Creek contends that the proper definition of the term "permitted livestock" is defined by agency regulation as:

(1) Those livestock grazing at the time of purchase.

(2) If the purchase took place outside the grazing season, those livestock which grazed under the term grazing permit during the season immediately preceding purchase, including any offspring retained for herd replacement. Yearlings grazed as a part of the normal livestock operation may be considered permitted livestock.

(AR at 298 (FSH 2209.13, 16-19).)  Relying on this definition of permitted livestock, Fence Creek argues that "the inquiry is properly focused on whether Fence Creek acquired the cows that actually grazed the Allotment the prior season. . . ."  (Pl.'s Mem. Supp. Summ. J. 15-16.)

With respect to the 247 cattle on the Log Creek allotment, the Forest Service's December 9, 2005 Decision was to the point:  Fence

Page 24 - FINDINGS AND RECOMMENDATION

Creek provided "no supporting documents" to show it "*actually* acquired 247 head of permitted livestock from Geraldine Lewis and Barbara Kudrna. . . ." (AR at 775 (emphasis added).)

The Term Grazing Permit issued to the Agars provided:

**7. Ownership Requirement**

(a) Only livestock owned by the permittee are authorized to graze under this permit. To exercise use of the permit, the permittee will furnish all evidence of ownership requested by the Forest Service. . . .

(AR at 530 (Term Grazing Permit, Part 2 ¶ 7(a)).) In a letter dated June 28, 2005, Barbara Walker specifically requested Oregon brand inspection certificate documentation to show "how many and when livestock were purchased." (AR at 628.) In her letter, Walker expressly referenced the 247 cows permitted to Kudrna and Lewis. In response, the Agars referenced and attached two Oregon Brand Inspection Certificates: #C262812 (600 cows sold to Fence Creek) and #C262813 (859 cows sold directly to buyers other than Fence Creek). (AR at 451, 452.)

In a letter dated September 6, 2005, Walker again expressly requested Oregon state brand inspection documentation to show that "Fence Creek purchased 247 head of permitted cattle from Geraldine Lewis and Barbara Kudrna." (AR at 681.) In response, the Agars stated simply: "There is no Oregon State Brand Inspection Showing Fence Creek purchased 247 head of permitted cattle from Geraldine Lewis and Barbara Kudrna." (AR at 729.)

Fence Creek now argues that the 247 cattle previously

Page 25 - FINDINGS AND RECOMMENDATION

permitted to graze on the Log Creek allotment were included among the 1,459 cattle and 92 bulls listed in the Bill of Sale. As set forth above, Fence Creek failed to establish that it purchased 859 of the cows identified in the Bill of Sale. Further, with respect to the 600 remaining cows, the court notes the Brand Inspection Certificate #C262812, dated October 31, 2003, lists the Owner/Seller of the 600 cows sold to Fence Creek as Garnet Lewis/Curtis Lewis, not Barbara Kudrna and Geraldine Lewis. (AR at 451.) Additionally, the Certificate documents the brands of those 600 cows as Lucky Diamond and El, not Half Box D brand permitted on Log Creek.

Nor does the Kudrna affidavit relied upon by Fence Creek resolve the issue of permitted livestock. In December 2005, Barbara Kudrna submitted an affidavit stating: "Fence Creek Cattle Company, a partnership consisting of Bruce and Mary Agar, purchased the 247 head of cattle branded with the Half Box D brand permitted to graze on the Log Creek Allotment. . . ." (AR at 783.) Additionally, Kudrna testified that: "The 247 head of cattle permitted on the Log Creek Allotment and purchased by Fence Creek Cattle Company, were part of the 1459 cows and 92 bulls included in the Bill of Sale dated December 15, 2003." (AR at 783.) The Administrative Record also includes Kudrna and Lewis's Application for Term Grazing Permit, dated February 2, 2002, for the Log Creek allotment. By their application, Kudrna and Lewis sought a grazing

Page 26 - FINDINGS AND RECOMMENDATION

permit on the Log Creek allotment for *247 cows marked with the Half Box D brand*. (AR at 362).

Despite the Kudrna affidavit, there is insufficient evidence that the 247 cows on the Log Creek allotment were among the 600 purchased by Fence Creek, rather than the 859 cows sold to buyers other than Fence Creek.  Fence Creek neither sets forth a "chain of evidence" (documentation) with respect to those 247 cows, nor explains to the court why it is unable to do so.  The court may not simply ignore the conflicting evidence in the record.  For example, the record includes Kudrna's sworn statement that the 247 cows permitted on the Log Creek allotment were marked with the Half Box D brand (AR at 783); the Kudrna/Lewis Application for Term Grazing Permit identifying the 247 Log Creek cattle as marked with the Half Box D brand (AR at 362); and the Agar's Application for Term Grazing Permit in which they indicated some purchased cattle were marked with the Half Box D brand (AR at 525.)  Yet, the Oregon Brand Inspection Certificate #C262812 identifies only the Lucky Diamond and El brands on the 600 Fence Creek cattle.  There were no cows with the Half D brand grazing on the Log Creek allotment under Fence Creek's grazing permit.

Fence Creek urges the court to ignore the evidentiary contradictions of record and simply accept its representation that "Fence Creek bought the Lewis Family herd" and "[t]his included those cattle grazing the Log Creek Allotment in the preceding

season." (Pl.s' Reply Mem. 11).   That is not the court's role here.   Rather, the court is statutorily charged with the duty of reviewing the decision by the agency to determine whether there was some reasonable basis to support the findings.    Without question, the record is contradictory with respect to whether permitted livestock were grazing on the Log Creek allotment.   Even setting aside the dispute over brands and assuming that Lewis and Kudrna grazed cattle with the Lucky Diamond brand, Fence Creek is still unable to show that the 247 cows grazing on the Log Creek allotment were the livestock either "grazing at the time of purchase" or "those livestock which grazed under the term grazing permit during the season immediately preceding purchase." FSH 2209.13, 16-19 (AR at 298, *see also* AR at 361 (Conditions and Requirements for the Issuance of a Term Grazing Permit because of Purchase or Permitted Livestock or Base Property).)   In a letter dated July 13, 2005, the Agars relied upon the 600 head "*purchased from Garnet Lewis*" to stock the Chesnimnus allotment, which contradicts the notion that 247 head from that 600 were purchased from Kudrna/Lewis and were grazing on the Log Creek allotment.   (AR at 664 (emphasis added).)

The court finds a rational basis for the Forest Service's decision that Fence Creek failed to show it purchased the 247 head of Log Creek allotment stock from Kudrna/Lewis.   The court should decline to set aside that decision as arbitrary and capricious.

Finally, in its December 2005 Decision, the Forest Service

stated:  "We are canceling the entire permitted season and use on the Log Creek Allotment from the Fence Creek Term Grazing Permit for failure to comply with the conditions for waiver of a term grazing permit."  (AR at 777.)  Fence Creek maintains that the Forest Service's decision to cancel the Log Creek allotment from the grazing permit is unsupported by the record and contrary to applicable regulations.  (Pl.'s Mem. Supp. Summ. J. 18.)  Fence Creek challenges the Forest Service's decision to cancel the Log Creek allotment on the ground that the Forest Service failed to make the required finding of "specific intent" to deliberately, knowingly and willfully mislead the agency in acquiring or maintaining the permit.  (Pl.'s Mem. Supp. Summ. J. 19.)  Additionally, Fence Creek charges that the Forest Service improperly relied upon the Regional Interim Directive framework to cancel the permit.[14]  (Pl.'s Mem. Supp. Summ. J. 21.)

Pursuant to applicable regulations, the Forest Service may cancel or suspend a permit for noncompliance with provisions and requirements of the permit or governing regulations; or for a knowing and willful false statement made in the grazing

---

[14]    Fence Creek relies on *Western Radio Services v. Epsy*, 79 F.3d 896, 901 (9th Cir. 1996), to argue that the federal regulations are "the *only* regulatory standard that carr[y] force and effect of law creating a binding limitation on Forest Service authority or those subject to it." (Pl.s' Mem. Supp. Summ. J. 19 (emphasis in original).)  Regardless, the Forest Service is permitted to rely on the Forest Service Manual and Handbook for guidance, to rely on certain criteria and to interpret the language of the regulations. *See id.* at 901.  Thus, as set forth below, the court finds that the federal regulations provided the authority to cancel the permit.

application.    *See*  36  C.F.R.  §§  222.4(a)(4)  and  (a)(5).    The
requirement  that  a  permittee  comply  with  regulations  or  face  the
penalty  of  cancellation  was  set  forth  in  at  least  three  different
documents  signed  by  the  Agars:

- Waiver  of  Term  Grazing  Permit,  clause  4(b)  states:
  Failure  to  comply  with  the  following  requirements  may
  result  in . . . cancellation  of  the  term  grazing  permit:
  (b)  Purchased  livestock  identified  on  the  purchaser's
  term  grazing  permit  application  must  have  been  permitted
  to  graze  under  the  seller's  term  grazing  permit  at  the
  time  of  purchase. . . .  (AR  at  361,  528.)

- Application  for  Term  Grazing  Permit  states:    It  is  fully
  understood  and  agreed  that  the  grazing  permit . . . may
  be  cancelled . . . for  failure  to  comply  with  any  of  the
  provisions  and  requirements  specified  in  the  grazing
  permit;  or  for  failure  to  comply  with  regulations  of  the
  Secretary  of  Agriculture  on  which  the  permit  is  based,  .
  . . or  for  knowingly  and  willfully  making  a  false
  statement  or  representation  in  this  application. . . .
  (AR  at  525-526.)

- Term  Grazing  Permit,  Part  1,  clause  3  states:    It  is
  fully  understood  and  agreed  that  this  permit  maybe  be  .
  . . cancelled . . . after  written  notice,  for  failure  to
  comply  with  any  of  the  terms  and  conditions  specified  in
  Parts  1,  2,  and  3  hereof,  or  any  of  the  regulations  of
  the  Secretary  of  Agriculture  on  which  this  permit  is
  based . . . ;  or  for  knowingly  and  willingly  making  a
  false  statement  or  representation  in  the  permittee's
  grazing  application.  (AR  at  529.)

Federal  regulations  authorize  a  new  term  permit  to  be  issued
to  "the  purchaser  of  a  permittee's  permitted  livestock."  36  C.F.R.
§  222.3(c)(1)(iv).    As  set  forth  above,  the  Forest  Service
determined  that  Fence  Creek  failed  to  establish  that  it  had
purchased  the  permitted  cows  for  the  Log  Creek  allotment,  contrary
to  the  clear  and  express  requirements  of  the  Waiver  of  Term  Grazing

Page 30 - FINDINGS AND RECOMMENDATION

Permit, the Application for Term Grazing Permit and the Term Grazing Permit. On four different occasions, by their signature, the Agars represented to the Forest Service that Fence Creek had purchased cows that they later admitted they had not purchased. *See, e.g.,* compare AR at 558 (Waiver for 850 cows); AR at 525 (Application for 1459 cows); (Grazing Permit for at least 1229 cows); AR at 675 (Agar's Waiver of Term Grazing Permit for 850 cattle in favor of Fence Creek Ranch LLC.); with AR at 452 (Brand Inspection Certificate for 859 cows sold to unspecified purchaser); AR at 642 (Agars inform Forest Service they purchased only 600 cows); AR at 665 (600 head), 670 (same), 730 (same). *See also* AR at 493 (Bill of Sale identifying the Agars as purchasers of 1459 cows and 92 bulls). Fence Creek never asserted that it was unaware of the contents of the documents it signed, including the representations that they had purchased 1459 cows.

Fence Creek insists that a lesser sanction should have been imposed pending resolution of the discrepancies noted by the Forest Service. Fence Creek does not, however, contend that the Forest Service failed to consider all relevant evidence or that Fence Creek has additional documentation to establish ownership of the permitted cattle. Other than expanding the record to include evidence of other, unrelated permits, Fence Creek offers no new or additional evidence to prove that it actually purchased the cows that were permitted to graze on the Log Creek allotment. A review

Page 31 - FINDINGS AND RECOMMENDATION

of the administrative record shows that the Forest Service made repeated requests for some proof of purchase; engaged in numerous meetings and communications; outlined the required documentation in two formal letter requests; and issued three written decisions. In the end, the Forest Service propounded two rational bases for its decision to cancel the Log Creek allotment grazing permit: (1) noncompliance with applicable terms and regulations; and (2) making a false statement to the agency. Both of these bases withstands our narrow and deferential standard of review under the APA. The court should decline to set aside that decision as arbitrary and capricious.

          2.   Chesnimnus Permit

     In its December 2005 Decision, the Forest Service first "reduc[ed] the Chesnimnus Allotment's stocking from 850 to 600 head" in accordance with its finding that Fence Creek was able to establish that it had purchased 600 head of the Lewis's permitted livestock. The Forest Service next determined that "Fence Creek did not own all livestock on the Chesnimnus allotment. They were aware of and authorized stocking of 200 head of Wayne and Michael Smith and 175 head of Monty and Shelly Siddoway's livestock." (AR at 777.) Based on this finding, the Forest Service "cancel[ed] the Chesnimnus Allotment portion of the Fence Creek Term Grazing Permit based on non-compliance with the Term Grazing Permit, part 2 clause 7(a)." (AR at 777.)

With respect to the reduction in livestock on the Chesnimnus allotment from 850 to 600 head, Fence Creek once again challenges the Forest Service's determination that Fence Creek failed to purchase the permitted livestock and relies on the same arguments as set forth under the Log Creek analysis. Those arguments were addressed above and will not be restated here. Moreover, the Forest Service reduced the permitted livestock on the Chesnimnus allotment from 850 to 600 because only 600 head were validated as required. (AR at 805-806 (FSH 2209.13, Part 15.1a, Validation); AR at 822 (FSH 2209.13 , Chapter 16.2e, Number 9, Failure to Validate the Grazing Permit and Notice of Permit Action for Non-Compliance).) The Forest Service's decision to reduce the Chesnimnus allotment's stocking from 850 to 600 head based on its finding that Fence Creek purchased only 600 head from Delbert and Garnet Lewis should not be set aside as arbitrary and capricious.

Fence Creek also challenges the Forest Service's finding that, in 2004, Fence Creek allowed grazing of unpermitted livestock on the Chesnimnus allotment; namely 200 head with both the Fence Creek and the Wayne and Michelle Smith brands, and 175 head with both the Fence Creek and Monty and Shelly Siddoway brands. Fence Creek contends that "Fence Creek culled cattle from the Lewis/Lucky Diamond herd, and replaced a portion of them with the 200 cows contributed to Fence Creek by Wayne Smith and 175 cows contributed by Monty Siddoway." (Pl's. Mem. Supp. Summ. J. 27.)

After discovering discrepancies in the ownership of the livestock on the Chesnimnus allotment during the 2004 grazing season, the Forest Service made specific requests for documentation to establish Fence Creek's ownership. Again, the Forest Service was seeking evidence that the Fence Creek partnership, consisting only of Bruce and Mary Agar, had purchased the livestock--200 head with the Fence Creek/Smith brands and the 175 head with the Fence Creek/Siddoway brands--prior to stocking them on the Chesnimnus allotment. *See, e.g.*, AR at 628-629 (formal letter request for specific documentation); AR at 680-682 (same); AR at 772-780 (December 2005 Decision outlined required documentation).

Fence Creek does not dispute that only livestock owned by Fence Creek were authorized to graze on the Chesnimnus allotment. The regulation is clear: "New term permits may be issued to the purchaser of a permittee's permitted livestock. . . ." 36 C.F.R. § (c)(1)(iv). The terms set forth in both Part 2 of the Waiver of Term Grazing Permit and the FSH require the applicant for a Term Grazing Permit to present at least: "A properly executed and recorded or notarized bill of sale, with canceled check or receipt to document sale of permitted livestock." *See, e.g.,* AR at 361 (Waiver Form); AR at 298, 419, 840 (FSH).

In a letter response dated July 13, 2005, the Agars attempted to explain the presence of the Smith/Siddoway cattle on the Chesnimnus allotment as follows:

Page 34 - FINDINGS AND RECOMMENDATION

b.  Fence Creek . . . *obtained* an additional 200 head of cows and 10 bulls from Wayne Smith for running on the property and *obtained* another 175 head from Monty Siddoway to run as part of the Fence Creek operation. . . .

c.  The Fence Creek Cattle Company paid Wayne Smith $523,895.05 for the 200 head of cows. Only part of this money went to Wayne Smith for the 200 cows the rest of the money went to pay off the original cow note. The Fence Creek Cattle Company also had 175 head cows and 10 bulls from Monty and Shelly Siddoway under the Fence Creek Brand.

d.  The Lucky Diamond brand was then placed on Wayne Smith's cattle on the first part of June 2004 before they went out on the Forest Service land.

(AR at 664-665 (emphasis added).)

Five days later, on July 18, 2005, the Agars provided additional information as follows:

There is no paper trail on the >L cows. . . .

*In Sept. Old West Federal Credit Union needed money. Mary and I borrowed a considerable amount of money from our personal bank and bought all of the cows wearing the Lucky Diamond iron*, these were to include the >L cows. I wrote Wayne a check for $523,895.05 and also wrote a large check to Old West Federal Credit Union for cow purchases.

(AR at 672 (emphasis added).)

Finally, in a letter dated September 30, 2005, the Agars stated as follows:

4.  Issue Two: Authorized Livestock.

A.  Monty and Shelly Siddoway (Half Box Lazy S) Shelly Siddoway is our daughter. As a child of a Permittee, we believed her cattle could be run on the Permits legally.

Additionally, in late fall of 2003, Monty and Shelly were to have been partners in Fence Creek Cattle Company. However, because of financing issues, they subsequently were kept out of the Partnership. Nonetheless, they did

Page 35 - FINDINGS AND RECOMMENDATION

*contribute* their cattle to the Partnership in June of 2004.

B.  Wayne and Michelle Smith Cattle (Lazy VL). Wayne and Michelle Smith were also to have been partners in Fence Creek Cattle Company.  Again, because of financing issues, they were not made Partners.  They also *contributed* their cattle to the Partnership in June of 2004.  Subsequently, I acquired those cattle in the fall of 2004 (around September 30th).

5.    Ownership of Smith and Siddoway Cattle.

3A.  There is no brand inspection, dated prior to June 1, 2004, showing that Fence Creek purchased 200 head of livestock from Wayne and Michelle Smith.

3B.  There is no brand inspection, dated prior to June 1, 2004, showing that Fence Creek purchased 175 head of livestock from Monty and Shelly Siddoway.

3C.  There are no executed and recorded or notarized Bills of Sale or cancelled checks or receipts to document the sale of livestock from the Smiths and Siddoways to Fence Creek.

As indicated in paragraph 4 above, the Smith Cattle were *contributed;* the Siddoway (owned by my daughter and her husband) were also *contributed.*

(AR at 731 (emphasis added).)   As set forth above, the Agars concede that "[t]here are no executed and recorded or notarized Bills of Sale or cancelled checks or receipts to document the sale of livestock from the Smiths and Siddoways to Fence Creek."  Nor are there brand inspection reports that show a purchase prior to June 4, 2004.

Fence Creek also contends that it culled Lewis cows and replaced them with cattle contributed by Monty Siddoway and Wayne Smith.  While Forest Service policy does recognize an opportunity

to cull livestock, "A purchaser who does not desire to graze purchased livestock on National Forest System lands . . . during the permitted period of use following the purchase must request permission from the Authorized Officer in writing and explain the reasons for the request." (AR at 361 (Waiver of Term Grazing Permit).) Fence Creek does not contend, nor is there any evidence in the record, that it either made or received a request in writing to cull the purchased livestock. Moreover, the Wallowa-Whitman National Forest permit limits replacement or culling of the authorized herd to 20% or less. (AR at 555.) In this case, even assuming Fence Creek purchased the 850 heard, it represents that 375 cattle of that heard of 850 were culled. That amount, 44%, is clearly in violation of Forest Service policy.

Fence Creek also points to the permitted Lucky Diamond brand that appeared on the Smith and Siddoway cattle as evidence that those cattle were owned and controlled by Fence Creek. In accordance with the express terms of the Waiver and the FSH, branding alone is insufficient to show ownership. Rather, there must be some documentation in the form of a bill of sale, cancelled check or receipt. While the record does include a $523,895.05 check to Wayne Smith written on the Durbin Creek Ranch account and signed by Bruce Agar, the check is dated September 30, 2004, well beyond June 2004, when the cattle were turned out to the Chesnimnus allotment. (AR at 575.) Additionally, in their letter dated

Page 37 - FINDINGS AND RECOMMENDATION

September 30, 2005, the Agars clearly stated that no such documents exist. (AR at 731 ("There are no executed and recorded or notarized Bill of Sale or cancelled checks or receipts to document the sale of livestock from the Smiths and Siddoways to Fence Creek.").)

The record reflects Agars' uncontroverted admissions that neither the Smiths nor the Siddoways were ever partners in Fence Creek and that no documents exist to show purchase or ownership of the Smith/Siddoway cattle prior to June 2004. This is sufficient evidence to support the Forest Service's reasonable determination that Fence Creek did not purchase or own the Smith or Siddoway cattle prior to stocking them on the Chesnimus allotment in 2004. The Forest Service's finding that Fence Creek failed to establish that the Smith (200 head) and Siddoway (175 head) cattle were permitted livestock for grazing on the Chesnimus allotment was reasonable. Accordingly, the court should decline to set aside that finding as arbitrary and capricious.

Finally, Fence Creek insists that cancellation of the Chesnimus allotment for allowing unpermitted livestock on the allotment was unjustified. According to Fence Creek, "the proper approach in the 'unpermitted livestock' situation is to provide notice of 'non-compliance and require full removal of the livestock, or submission of positive proof of ownership, within 72 hours.'" (Pl.'s Mem. Supp. Summ. J. 28 (quoting Regional Interim

Directive 2209.13-2004-9 ch 16.21d(10).)   Alternatively, Fence Creek contends that if the Forest Service is relying on "false statements or misrepresentations" for cancellation, the agency failed to document the required finding of "knowing and willful" conduct by Fence Creek.  (Pl.'s Mem. Supp. Summ. J. 29.)

The Term Grazing Permit sets forth the following requirement:

**7.    Ownership Requirement**
(a) Only livestock owned by the permittee are authorized to graze under this permit.  To exercise use of the permit, the permittee will furnish all evidence of ownership requested by the Forest Service. . . .

(AR at 530 (Term Grazing Permit, Part 2 ¶7(a)).)   The Forest Service Handbook 2209.13, Chapter 16.2e(10) provides:

10.   <u>Grazing Livestock Not Owned by Permittee</u>. Only livestock owned by the permittee are authorized to graze under the permit.  Leased brands are not recognized as proof of ownership.  Livestock purchased and subsequently sold back to the original owner, within a 24-month period is not considered evidence of valid ownership of the livestock. Grazing Permit, Part 2, Clause 7 (a) and ©).

<u>Notice of Permit Action for Non-Compliance</u>. Unless specific circumstances indicate otherwise, this violation is considered to be willful and no opportunity for remedy is provided. When documented inspection indicates that grazing of livestock not owned by the permittee has occurred, call or meet with the permittee in person to explain the non-compliance. Indicate what parts of the Term Permit are in non-compliance and require full removal of the livestock, or submission of positive proof of ownership, within 72 hours. If acceptable proof of ownership is not provided within 72 hours, notify the permittee by notice of permit action for non-compliance letter, Certified Delivery - Return Receipt Requested, that the permit is being cancelled.

(AR at 822.)

Page 39 - FINDINGS AND RECOMMENDATION

As set forth above, the Forest Service reasonably concluded that Fence Creek did not purchase the cattle grazing on the Chesnimnus allotment in June 2004, in accordance with applicable requirements and guidelines.    In June 2005, the Forest Service notified Fence Creek of its concerns regarding ownership of the cattle grazing on the Chesnimnus allotment.    (AR at 628-629.)    For nearly six months, the Forest Service worked with Fence Creek and other interested parties to resolve the issues surrounding ownership of the livestock grazing on the Chesnimnus allotment. The record is filled with documents reflecting meetings, communications and correspondence between Forest Service officials, Fence Creek and interested parties during this time.    In fact, Forest Service officials continued to meet and correspond with the interested parties throughout the appeals process in an effort to resolve the ownership issues.    *See, e.g.,* AR at 896 (Meeting Notes, March 1, 2006).    Moreover, Fence Creek does not contend that it has new or additional information regarding ownership of cattle on the Chesnimnus allotment for June 2004.

Pursuant to applicable regulations, the Forest Service may cancel or suspend a permit for noncompliance with provisions and requirements of the permit or governing regulations.    *See* 36 C.F.R. § 222.4(a)(4).    Moreover, the requirement that a permittee must comply with regulations or face the penalty of cancellation was set forth in at least three different documents signed by the Agars.

Page 40 - FINDINGS AND RECOMMENDATION

With the 2004 season having passed, and no new or additional evidence forthcoming from Fence Creek, the court is satisfied that the Forest Service's decision to cancel the grazing permit for the Chesnimnus allotment was reasonable and authorized by applicable regulations and guidelines.  The court should decline to set aside that decision as arbitrary and capricious.

3.  Due Process

Fence Creek contends that the Forest Service's administrative review procedures violated due process.  Fence Creek raises a variety of due process claims that the Forest Service's review procedures, either facially or as applied here, violate constitutional and/or statutory due process protections.

The Fifth Amendment protects individuals from deprivations of "life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  To prevail on its due process claim plaintiff must show that it had a constitutionally protected interest of which defendants deprived plaintiff without due process.  *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)*.*

In *American Mfrs.*, the Supreme Court clarified how courts must analyze due process claims:

> The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty."  Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process.

*Id.* (internal citations omitted).  Thus, the court must first

examine whether Fence Creek was deprived of a protected due process interest before reviewing the Forest Service's procedures to ensure that they comport with due process.

Fence Creek argues that its members possess protected property interests in their grazing permits.  The Supreme Court holds that "[a] property interest in a benefit protected by the due process clause results from a legitimate claim of entitlement created and defined by an independent source, such as state or federal law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Further, this interest does not arise whenever a person has only an "abstract need or desire for," or "unilateral expectation of," a benefit. *Id.*

The Taylor Grazing Act expressly states that a permit to graze livestock on public lands "shall not create any right, title, interest, or estate in or to the lands." 43 U.S.C. § 315b (1994). The Ninth Circuit has clearly held that the regular renewal of grazing permits does not create a compensable property interest, and that grazing permits are a privilege, not a right. *Swim v. Bergland*, 696 F.2d 712 (9th Cir. 1983).  In *Swim*, the court stated: "[t]he license to graze on public lands has always been a revocable privilege." *Id.* at 719.  Further, the court noted:

> It is safe to say that it has always been the intention and policy of the government to regard the use of its public lands for stock grazing, either under the original tacit consent or, as to national forests, under regulation through the permit system, as a privilege which is withdrawable at any time for any use by the sovereign[.]

Page 42 - FINDINGS AND RECOMMENDATION

*Id.* Accordingly, Ninth Circuit case law compels this court to find that no property interest in livestock grazing permits exist.

Similarly, the Tenth Circuit analyzed whether permittees have a legitimate due process claim to the terms and conditions of grazing permits and found no such claim exists. *See Fed. Lands Legal Consortium v. United States*, 195 F.3d 1190, 1198-99 (10th Cir. 1999). The court in *Federal Lands* determined that the administrative discretion involved in granting a permit or revoking an implied license negates any property interest. *Id.* at 1197-1200.

Here, the court relies on established law holding that a grazing permit does not confer a property right upon its owner. Because a due process claim cannot stand without a valid property interest, Fence Creek's due process claim should fail as a matter of law.

## Conclusion

Based on the foregoing, Fence Creek's Motion for Judicial Notice, or Alternatively, for Extra Record Review (doc. #40) should be DENIED; Fence Creek's Motion for Summary Judgment (doc. #42) should be DENIED; and the Forest Service's Motion for Summary Judgment (doc. #52) should be GRANTED. Fence Creek's Complaint should be DISMISSED with prejudice.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due **August 4, 2008**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this  21st   day of July 2008.


      /s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge

Page 44 - FINDINGS AND RECOMMENDATION