FILED'08 OCT 16 10:31 USDC-ORP

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FENCE CREEK CATTLE CO.,

    Plaintiff,

v.

UNITED STATES FOREST SERVICE, et al.,

    Defendants.

ORDER

Civil No. 06-1236-SU

HAGGERTY, Chief Judge:

    Magistrate Judge Sullivan referred to this court a Findings and Recommendation [62] in this matter. Judge Sullivan recommends that plaintiff's Motion for Judicial Notice, or Alternatively, for Extra-Record Review [40] should be denied; plaintiff's Motion for Summary Judgment [42] should be denied; and defendants' Motion for Summary Judgment [52] should be granted. Plaintiff Fence Creek Cattle Co. (Fence Creek) filed timely objections requesting oral argument and defendants United States Forest Service, et al. (Forest Service) filed timely responses. This court, having reviewed the parties' arguments and the record, concludes oral

1 - ORDER

argument is not necessary. For the following reasons, the Findings and Recommendation is adopted.

**STANDARDS**

When a party objects to any portion of a Findings and Recommendation, the district court must conduct a *de novo* review. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Bus. Mach. Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

District courts review the decision of the Forest Service under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* (APA). Under the APA, a district court may overturn an agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378.

A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm.*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency need only articulate a rational connection between the facts found and the

2 - ORDER

conclusions made. *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency. *O'Keeffe's*, 92 F.3d at 942.

**BACKGROUND**

The history of this matter is complex and disputed. The facts are further complicated by contradictory and inconsistent declarations from Fence Creek. Full discussions of the facts can be found in the Findings and Recommendation, plaintiff's Concise Statement of Material Facts, and the Administrative Record (AR). This court need not discuss every detail of this case's complex history. However, because plaintiff has objected to Judge Sullivan's factual findings, this court provides a summary of the facts most salient to the issues at hand.

This action arises from a series of land and livestock transactions in Eastern Oregon. In September 2003, the Lewis family (Lewis) sold the Lucky Diamond Ranch to Gazelle Land and Timber, LLC (Gazelle). Defendant's Concise Statement of Material Facts, Attachment A (Def. Facts A). Gazelle initially consisted of King Williams and Michael Smith, each with a one-third membership, and Bruce and Mary Agar owning the remaining third of the LLC. Under the sales agreement, Lewis agreed to deliver grazing permit waivers for Forest Service allotments to Gazelle. Findings and Recommendation at 5. These allotments included the Log Creek and Chesnimnus allotments at issue in this case. *Id.* The sales agreement also provided that parcels of the Lewis property would be deeded to Fence Creek. Def. Facts A, at 27.

Fence Creek was a partnership registered in Oregon. It was created by Bruce and Mary Agar pursuant to a partnership agreement executed on February 4, 2004. AR 523-24. The partnership agreement listed Bruce and Mary Agar as the sole members of Fence Creek. *Id.* On December 15, 2003, Lewis executed a Bill of Sale and escrow instructions indicating the sale of

3 - ORDER

1,459 cattle and 92 bulls to Fence Creek. *Id.* at 493-96. The Bill of Sale indicated that Fence Creek was a partnership consisting of Wayne Smith, Michele Smith, Bruce Agar, and Mary Agar. Fence Creek provided this information to the Forest Service. Findings and Recommendation at 6.

On February 5, 2004, Fence Creek applied for a grazing permit from the Forest Service for the Log Creek and Chesnimnus allotments, and two other allotments not at issue in this case. AR 525-26. The grazing permit was supported by waivers from Lewis and Barbara Kurdna, the permittees then holding the grazing permit. *Id.* at 527-28. On February 6, 2004, the Forest Service issued a Term Grazing Permit for the allotments to Fence Creek. The permit authorized 850 cattle to graze the Chesnimnus allotment and 247 cattle to graze the Log Creek allotment. *Id.* at 525.

On February 26, 2004, Fence Creek entered into a joint venture agreement with Gazelle; Wayne Smith and Michele Smith; and Monty Siddoway and Shelly Siddoway. Findings and Recommendation at 7. Under the joint venture agreement, Fence Creek agreed "to maintain all necessary documentation for the validation and maintenance of the 'Allotments'." AR 579. Fence Creek further agreed that the "[a]llotments shall provide the forage necessary for the cattle purchased and replaced by Fence Creek, Smiths, and Siddoways." *Id.*

In June 2005, the Forest Service began to question the ownership of the cattle that had appeared on the allotments during the 2004 grazing season. Forest Service representatives had observed cattle on the Chesnimnus allotment that were branded with Wayne Smith's brand. AR at 603-05. Fence Creek cattle are branded with a Lucky Diamond brand. *Id.* at 604. It is unclear whether all the cattle with Wayne Smith's brand also had a Lucky Diamond brand. Forest Service ranger Rick Smith told Wayne Smith that he had observed cattle on the allotment with

Wayne Smith's brand, but without the Lucky Diamond Brand. *Id.* at 604. Wayne Smith responded that the cattle did have a Lucky Diamond Brand. *Id.* Rick Smith checked the cattle and "found a very small [Lucky Diamond brand] on some cows." *Id.* Wayne Smith stated that he had sold 200 cows to Fence Creek and Rick Smith asked for documentation proving this. Wayne Smith said he would provide the documentation. *Id.*

On June, 13, 2005, Rick Smith talked with Bruce Agar about the Fence Creek grazing permits. Bruce Agar stated that Wayne Smith was supposed to have been made a partner in Fence Creek but that this had never happened. *Id.* at 605. Rick Smith requested that, by June 22, 2005, Wayne Smith and Bruce Agar provide written clarification regarding the branding and ownership of the cattle seen on the Chesnimnus allotment. AR at 605.

At this time, the joint venture between Fence Creek, Gazelle, the Smiths, and the Siddoways was falling apart. On June 17, 2005, the parties executed a "Settlement Agreement, Dissolution Agreement, Indemnification Agreement and Release of Claims " (Settlement Agreement). Def. Facts Attachment B at 22-26. Pursuant to the Settlement Agreement, Fence Creek transferred "all right, title and interest in the Fence Creek partnership, Fence creek brands . . . and the Associated U.S. Forest Service Grazing Allotments" to Gazelle or its nominee. *Id.* at 23. As part of the settlement agreement the Agars transferred their membership units in Gazelle to Michael Smith and King Williams. *Id.* at 22.

On June 24, 2005, King Williams notified the Forest Service that he was "now Fence Creek Cattle Company." AR 623. Williams stated that the partnership would keep the name but that its new partners would be Wayne Smith and Gazelle. *Id.* However, there is no evidence in the record that Fence Creek was ever registered as a partnership with partners other than Bruce and Mary Agar. Findings and Recommendation at 10, n.8.

5  - ORDER

On June 28, 2005, District Ranger Barbara Walker, sent a letter to the Agars requesting information clarifying whether the requirements of the grazing permit had been met. AR 628. Ranger Walker reminded the Agars that under their permit, "only livestock owned by the permittee are authorized to graze," and that the "documentation Fence Creek Cattle Company has provided is not sufficient to show proof of ownership for livestock currently permitted on the allotments." *Id.* Ranger Walker stated that while they had the Bill of Sale for the 1,459 cattle, they did not have supporting documentation that "Fence Creek ever took possession of these livestock." *Id.* Walker requested that the Agars provide proof that they had taken possession of the cattle, such as a brand inspection certificate, bank drafts, or cancelled checks. *Id.* Additionally, Walker requested information concerning any cattle that had been culled from or added to the herd, and information regarding the status of the Fence Creek partnership. *Id.* at 628-29.

On July 5, 2005, the Agars went to a Forest Service office to discuss Ranger Walker's letter. AR 642. They informed the Forest Service that they had brand inspections and cancelled checks for 600 cattle they had purchased in 2003. When asked about the discrepancy between the Bill of Sale which indicated Fence Creek had purchased 1,459 cattle and their admission that they had only purchased 600, the Agars reaffirmed that they had only purchased 600 head. *Id.* At this time, the Agars asked for a copy of the Bill of Sale and stated that they had never received it. *Id.* They stated that King Williams kept most of their paperwork for them. *Id.* at 643. The Agars stated that it had been their intent to have a herd with 1000 cows and to allow the Siddoways and the Smiths to enter the partnership with 200 cows per couple. *Id.* at 642.

The Agars asked the Forest Service if they could waive their permit to King Williams. *Id.* The Forest Service responded that they could if Fence Creek had in fact purchased the

6   - ORDER

permitted cattle and that they still needed to resolve some questions regarding the actual number of cattle purchased and the ownership of the cattle that had appeared on the Chesnimnus allotment. *Id.* The Agars stated that they would like King Williams to answer the Forest Service's questions and wanted to see how he answered the Forest Service's questions before they responded. The Agars were instructed to answer the questions on their own. *Id.*

On July 13, 2005, and July 18, 2008, the Agars responded to Walker's letter and provided supporting documentation. The letters stated in relevant part that:

> During the four days 1459 cattle . . . were sorted into bunches and turned out on Forest Service land and then to deeded property. The six hundred (600) cattle on the Forest Service property and the other 859 being sold by us and the funds going to Garnet Lewis directly as the owner of those 859 head from whatever party that bought them . . .

AR 663.

> Bill of Sale from Garnet Lewis, PR Estate of Delbert Lewis showing that Fence Creek Cattle Company purchased 1459 head of Cows and 92 Bulls for the price of $1,250,000. Actually only 600 head of these Cows and 25 Bulls were Brand Inspected to Fence Creek Cattle Company. These 600 head were paid for by funds derived from a note payable at Old West Federal CreditUnion in Wayne Smith's name for $561,000.00

*Id.* at 670.

> Fence Creek Cattle Company then proceeded to run the 600 head of cattle purchased from Garnet Lewis on the property and obtained an additional 200 head of cows and 10 bulls from WayneSmith for running on the property and obtained another 175 head from Monty Siddoway to run as part of the Fence Creek operation, which puts the total cattle on the property at approximately 1000 head on the Forest Service property...The Fence Creek Cattle Company paid Wayne Smith $523,895.05 for the 200 head of cows...The Fence Creek Cattle Company also had 175 head cows and 10 bulls from Monty and Shelly Siddoway under the Fence Creek brand.

*Id.* at 664.

> In summary, the Fence Creek Cattle Company purchased 600 cows and then obtained another approximate 400 cows to validate the permit. These documents show that on these transactions. [sic] We did not lease any livestock on these permits.

*Id.* at 665.

7  - ORDER

Attached to the letter were two Oregon Brand Inspection Certificates. Certificate #C268212 indicates that 600 head of cattle were transferred from Lewis to Fence Creek. *Id.* at 451. Certificate #C262813 indicates that 859 cattle were transferred from Lewis to an unspecified buyer. *Id.* at 452.

On July 12, 2005, King Williams and Michael Smith executed an "Articles of Conversion" to change Fence Creek Cattle Company into Fence Creek Ranch, LLC. AR 649. On September 1, 2005, the Agars transferred a 100 percent interest in Fence Creek to King Williams and Michael Smith, and signed a Waiver of Term Grazing Permit listing Fence Creek Ranch, LLC, as purchaser. Findings and Recommendation at 12. The waiver was not signed by the purchasers or any witness, and was incomplete. AR 675-76. On September 9, 2005, Fence Creek Cattle Ranch, LLC was registered with the Oregon Secretary of State. AR 969-70.

On September 6, 2006, Ranger Walker wrote another letter to the Agars and sent a copy to King Williams. In that letter, Ranger Walker informed the Agars that the information they had provided "appears to be either incomplete or contradictory to statements and permit application documentation you've submitted." AR 680. The purpose of the letter was to give the Agars "an opportunity to present full and complete . . . evidence and provide additional information," in order for the "term grazing permits to be waived." *Id.* The Agars were notified that "[f]ailure to demonstrate Fence Creek purchased adequate livestock to support waiver of the Geraldine Lewis and Barbara Kurdna permit could result in the cancellation of Fence Creek's Term Grazing Permit on the Log Creek Allotment . . . and 250 head from the Chesnimnus." *Id.* at 681. The Agars were told they needed to provide their response by September 30, 2005. *Id.* at 682.

On September 30, 2005, the Agars responded to Ranger Walker's letter that:

> The 600 head of mother cows purchased from Delbert and Garnett Lewis, as outlined in Brand Certificate No. C262812, were acquired with a loan from Old

8 - ORDER

> West Federal Credit Union in the amount of $561,000. Although this sum was borrowed by Wayne and Michelle Smith, I also signed the Note. Notwithstanding the use of Wayne and Michelle Smith as primary borrowers, I considered my signature on the Note as evidence sufficient of my responsibility for that debt and Fence Creek's acquisition of those six hundred head . . .
>
> . . . .
>
> Shelly Siddoway is our daughter. As a child of a Permittee, we believed her cattle could be run on the Permits legally . . . .
>
> . . . .
>
> Wayne and Michelle Smith were also to have been partners in Fence Creek Cattle Company. Again because of financing issues, they were not made Partners. They also contributed their cattle to the Partnership in June of 2004. Subsequently, I acquired those cattle in the fall of 2004 . . . There is no brand inspection, dated prior to June 1, 2004, showing that Fence Creek purchased 200 head of livestock from Wayne and Michelle Smith.

AR 730-31

On October 21, 2005, Bruce Agar notified the Forest Service that the brands registered to the Agars, including the Lucky Diamond brand, were being transferred to King Williams and Michael Smith, now doing business as Fence Creek Ranch, LLC. *Id.* at 736. On October 26, 2005, the Agars met with the Forest Service to discuss the status of their business and the grazing permit. *Id.* at 737. Rick Smith informed them that due to their two response letters, the Fence Creek permit would either be totally or partially cancelled, and that "the future of their Fence Creek Cattle Company permits were being discussed and studied by the Forest Service legal staff prior to making a final decision." *Id.* On October 31, 2005, King Williams also met with the Forest Service and was told that a decision had not yet been made on the permit. *Id.* at 743.

On December 9, 2005, the Forest Service issued a written decision cancelling the Fence Creek grazing permit for the Chesnimnus and Log Creek Allotments. *Id.* at 772-78. The decision outlined the facts leading to this decision and the rationale behind it. *Id.* The Agars were advised of Fence Creek's appeal rights. *Id.* In January 2006, the Agars granted power of attorney to King Williams, Michael Smith, and Fence Creek Ranch, LLC, for the purposes of appealing the Forest Service cancellation of the grazing permit. *Id.* at 847-48.

9 - ORDER

Fence Creek filed a timely appeal of the Forest Service decision. On March 1, 2006, at the request of Fence Creek, a meeting was held in an attempt to resolve the permit issues. *Id.* at 896-901. The Agars did not attend the meeting, it was held open for thirty days, and no resolution was reached. *Id.* After first and second-level appeals of the Forest Service decision, the Forest Service issued its final decision affirming the cancellation of the grazing permit on July, 20, 2006. *Id.* at 960-62. Fence Creek then initiated this action seeking judicial review of the Forest Service's final decision.

## FENCE CREEK'S MOTION FOR JUDICIAL NOTICE/EXTRA-RECORD REVIEW

Fence Creek requests that this court take judicial notice of twenty-five grazing permit files obtained from the Forest Service. Plaintiff seeks to expand the Administrative Record, and asserts these records will demonstrate that plaintiff has been treated unfairly.

Typically, judicial review of agency action is confined to the administrative record in existence at the time of the decision, and only under narrow circumstances will a district court allow expansion of that record. *The Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005); *see also Sw. Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). This court has evaluated Fence Creek's motion *de novo* and adopts Judge Sullivan's conclusion that expansion of the administrative record in this instance is inappropriate.

## FENCE CREEK'S OBJECTIONS

Plaintiff objects to Judge Sullivan's recommendation that this court grant the Forest Service's Motion for Summary Judgment. Plaintiff presents numerous legal and factual objections to the Findings and Recommendation. Many of these objections are without merit, or have been addressed previously by the Findings and Recommendation.

Plaintiff objects to the Findings and Recommendation's finding that plaintiff's due process

rights were violated by the Forest Service's administrative process. The Findings and Recommendation found that plaintiff's constitutional due process rights were not implicated by the cancellation of the permit because a grazing permit does not create a property interest for the purposes of the Due Process Clause. Findings and Recommendation at 43. Plaintiff contends that they have a statutorily protected due process interest in the grazing permit under the APA that was not addressed in the Findings and Recommendation.

Plaintiff relies on *Anchustegui v. Department of Agriculture*, 257 F.3d 1124 (9th Cir. 2001). In *Anchustegui*, the Ninth Circuit reversed a district court decision that upheld the Forest Service's cancellation of a sheep rancher's grazing permit. 257 F.3d at 1126. The court recognized that the Secretary of Agriculture may both issue and cancel permits for grazing on public lands, and that although a grazing permit does not "'create any right, title, interest, or estate,'" "'grazing privileges . . . shall be adequately safeguarded.'" *Id.* at 1128 (quoting 43 U.S.C. § 315(b)).

Under the APA, "a sanction may not be imposed . . . except in cases of willfulness . . . before the institution of agency proceedings." 5 U.S.C. § 558. The permit holder must be given "(1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c).

After a number of permit violations over a period of several years, the Forest Service issued a show cause letter to Anchustegui that stated "'permit action is warranted' and proposed 100 percent cancellation of the permit, requesting a response as to 'why this proposed permit action should not be taken.'" *Anchustegui*, 257 F.3d at 1129. The APA "requires written notice and an opportunity to demonstrate or achieve compliance, all 'before the institution of agency

11 - ORDER

proceedings.'" *Id.* (quoting 5 U.S.C. § 558). The Ninth Circuit held that Anchustegui was not afforded the opportunity to demonstrate or achieve compliance prior to the institution of agency proceedings because the show cause letter stated that "'permit action is warranted'" without prior written notice. *Id.* As such, the cancellation of Anchustegui's grazing permit was not valid. *Id.*

The facts in the instant case differ significantly from those presented in *Anchustegui*. Both the June 28, 2005, and the September 6, 2005, letters from Ranger Walker notified plaintiff of the documentation that was needed in order to satisfy the requirements of the grazing permit. Additionally, the September 6, 2005, letter notified plaintiff of the possible consequences should plaintiff fail to demonstrate compliance with the requirements of the grazing permit. AR 680. It was not until after several oral and written communications that agency action was taken. On numerous occasions, both informally and through written notice, plaintiff was apprised of the facts and conduct at issue and was given the opportunity to demonstrate that it had complied with the requirements of the grazing permit.

In *Anchustegui*, the agency determined that action was warranted before giving the plaintiff an opportunity to demonstrate that he had complied with the requirements of his grazing permit. The same cannot be said in this case. This court concludes that the Forest Service provided plaintiff with all process due under the APA.

Moreover, plaintiff was not entitled to the APA's procedural protections. The APA's procedural protections do not apply "in cases of willfulness." 5 U.S.C. § 558(c). In *Anchustegui*, the exception for willful conduct was not available because the Forest Service had not found Achustegui's conduct to be willful and the record did not establish that it was.

Here, the Forest Service found that plaintiff wilfully violated the permit. AR 912, 916. Plaintiff's assertion that the Forest Service did not make such a finding is without merit. In a

12 - ORDER

letter to the Forest Supervisor, dated March, 24, 2006, addressing Fence Creek's appeal, the district rangers noted that "Fence Creek failed to adhere" to the application for their term grazing permit. The application stated: "'It is fully understood and agreed that the grazing permit, if issued and accepted, may be cancelled or suspended, in whole or in part . . . for knowingly and wilfully making a false statement or representation in this application.'" AR 912. The district rangers also noted that plaintiff allowed livestock owned by other parties to graze on the allotment and "'[u]nless specific circumstances indicate otherwise, this violation is considered to be willful and no opportunity for remedy is provided.'" AR 916 (quoting Region 6/ Pacific Northwest Region Supplement to Forest Service Handbook 2209.13, Chapter 16.2e, Number 10). This court concludes that the Forest Service found that some of plaintiff's violations of their permit were willful.

This court must still determine whether the Forest Service's wilfulness finding was arbitrary and capricious. 5 U.S.C. § 706(2)(A). Under the APA, "a violation is 'willful' if the violator '(1)intentionally does an act which is prohibited, []irrespective of evil motive or reliance on erroneous advice, or (2) acts with careless disregard of statutory requirements.'" *Potato Sales Co. v. Dep't. of Agric.*, 92 F.3d 800, 805 (9th Cir. 1996) (citation omitted). The record shows that plaintiff acted with "careless disregard of statutory requirements." Plaintiff made false representations regarding the purchase of 1,459 cattle on the grazing permit application. Plaintiff also allowed cattle other than their own to graze the Chesnimnus allotment. The Forest Service articulated a rational connection between the facts and its conclusion. The willfulness finding made by the Forest Service is entitled deference by this court.

Plaintiff asserts that the Forest Service incorrectly found that plaintiff had only purchased 600 head of cattle from the Lewis family, when they actually purchased 1,459 cattle. Plaintiff

13 - ORDER

argues that the September 2003 agreement is an unambiguous contract for the purchase of 1,459 cows. Plaintiff contends that this contract is dispositive evidence of the number of cattle purchased and that the interpretation of an unambiguous contract is a question of law for the court.

This argument fails for several reasons. First, the question at issue here is not what the parties contracted to do, but what in fact occurred. Plaintiff was given numerous opportunities to prove that they had purchased 1,459 cattle, but they were unable to do so, and on more than one occasion asserted that they had only purchased 600 cattle.

Moreover, the contract in question fails to prove that plaintiff purchased 1,459 cattle. The contract lists the buyer as Gazelle Land & Timber L.L.C. (not Fence Creek) and it does not specify the number of cattle contracted for. Def. Facts A at 20-21. Looking only to the four corners of the document, as plaintiff would have this court do, the contract fails to prove that plaintiff purchased any cattle, much less 1,459 of them. The Forest Service's determination that only 600 cattle were purchased by plaintiff withstands this court's narrow and deferential standard of review.

With respect to the Chesnimnus allotment, plaintiff argues that the Forest Service illegally cancelled the permit after finding that unpermitted livestock were allowed to graze on the allotment. Plaintiff argues that, under applicable regulations, the Forest Service needed to provide them with seventy-two hour advance notice of the violation. The "regulation" pointed to is not, in fact, a regulation but merely guidance found in the Forest Service Grazing Permit Administration Handbook for the Pacific Northwest Region. AR 822. Furthermore, the June 28, 2005, letter provided plaintiff with adequate notice of the fact that the Forest Service was concerned that plaintiff was allowing unpermitted livestock to graze on the allotment. *Id.* at 628-

29.

Plaintiff also argues the Forest Service failed to warn that it might take permit action with respect to the Chesnimnus allotment. This argument is contradicted by the record. The September 6, 2005, letter clearly warns that failure to support the permit waiver could result in the cancellation of 250 head of cattle from the Chesnimnus allotment. AR 681. The Forest Service cancelled 250 head from the Chesnimnus allotment for failure to support the waiver and cancelled the remaining 600 head from the allotment for grazing cattle not owned by the permittee. The fact that plaintiff was not warned explicitly that this might happen in the September 6, 2005, letter is irrelevant. The APA requires only that a permittee be apprised of the facts or conduct warranting permit action. "The APA does not require that a respondent be apprised of precisely what action the agency will take because of his conduct." *Lawrence v. Commodity Futures Trading Comm'n*, 759 F.2d 767, 773 n.13 (9th Cir. 1985). Furthermore, because grazing of cattle not owned by the permittee is considered willful unless "specific circumstances indicate otherwise," the procedural protections of the APA were not required. AR 822.

Plaintiff argues that, because plaintiff was not warned of violations on the Chesnimnus allotment until after the 2004 grazing season, plaintiff was not given the opportunity to correct those violations. Neither the APA nor the Forest Service's guidelines requires an ongoing violation in order to cancel a permit. All that is required is that the permittee is put on notice of the facts or conduct which may warrant action and the opportunity to either achieve compliance or *demonstrate* compliance. 5 U.S.C. § 558(c). The alleged violations do not have to be ongoing; to conclude otherwise would prevent the Forest Service from redressing past violations. Fence Creek was given notice of facts warranting permit action and was given the opportunity to

15 - ORDER

demonstrate that they had not violated their permit. The law requires nothing more.

## CONCLUSION

For the foregoing reasons, the court adopts the Findings and Recommendation [62]. Plaintiff's Motion for Judicial Notice, or Alternatively, for Extra-Record Review [40] is denied; plaintiff's Motion for Summary Judgment [42] is denied; and defendants' Motion for Summary Judgment [52] is granted.

IT IS SO ORDERED.

DATED this 16 day of October, 2008.

Ancer L. Haggerty
United States District Judge

16 - ORDER